UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

IN RE:                                    )
                                          )
THOMAS MICHAEL ROSS,                      )
          Debtor.                         )
                                          )
**********************************        )
                                          )
HEATHER O'CONNOR,                         )        Case No. 3:18-cv-00495-PPS
          Appellant,                      )
                                          )
     v.                                   )
                                          )
THOMAS MICHAEL ROSS                       )
          Appellee.                       )

### OPINION AND ORDER

This case is before me on appeal from various orders of the Bankruptcy Court for

the Northern District of Indiana. Appellant Heather O'Connor's was unsuccessful in her

efforts to prevent Appellee Thomas Ross from being discharged from bankruptcy, and

she seeks review in this court. O'Connor offers a multitude of arguments relating to

how the bankruptcy court decided the issues in this case. The main thrust of her appeal,

however, is that Ross was a dishonest debtor who sought to conceal valuable assets in

order to get an unwarranted clean slate from the bankruptcy court. She says that Ross

failed to disclose an investment property. Then, once it was disclosed, he tricked the

bankruptcy trustee into undervaluing the property. After that, while the bankruptcy

was still pending, he transferred the property to his mother-in-law for no consideration

prior to the discharge order being entered in this case. She says these and other actions violated multiple sections of the Bankruptcy Code.

As discussed below, while I do not agree with all of O'Connor's argument completely as to Ross's supposed level of dishonesty, the mandate of the Seventh Circuit is clear on the transfer of the property and I must reverse the discharge and remand the case to the bankruptcy court for further proceedings.

## Background

Thomas Ross filed a petition for voluntary bankruptcy on July 2, 2016 under Chapter 7 of the Bankruptcy Code. [*See* DE 8 at 9-68.][1] Ross was self-employed as a general contractor, but costly lawsuits relating to two of his home remodeling jobs forced him into bankruptcy. [*See id.*] Ross listed Heather O'Connor, one of those unsatisfied customers, on his bankruptcy petition as a creditor. [*Id.* at 57.] Put mildly, O'Connor and Ross have a contentious history. In 2015, Ross filed a mechanic's lien against O'Connor's property after she, citing her dissatisfaction with his work, refused to pay him. [*Id.*] Ross later filed a lawsuit in state court against O'Connor, and she filed a counterclaim. [*Id.* at 142, ¶ 10.] This legal sparring preceded Ross's bankruptcy, which is why O'Connor is listed her as a creditor noting their pending litigation on his statement of financial affairs. [*Id.* at 31, 4.]

Shortly after Ross filed bankruptcy, O'Connor discovered that Ross had not disclosed a house he owned at 408 G Street in LaPorte, Indiana, on his bankruptcy

---

[1] Citations to pages in the Appellant's Appendix are given using the docket number and page number given at the center-bottom of each page.

schedule of assets. [*Id.* at 567-68.] O'Connor alerted her lawyer, who in turn brought it to the attention of the court-appointed bankruptcy trustee Joseph D. Bradley. [*Id.*] This property, along with some tools and a truck trailer of lesser significance, are at the center of this appeal.

On August 2, 2016, trustee Bradley conducted the Section 341 examination of Ross's financial affairs. [*Id.* at 531.] After discussing Ross's personal residence in LaPorte, Indiana, Bradley asked Ross if he had any other interest in real estate. [*Id.* at 191-92.] Ross informed Bradley that he owned another property, 408 G Street, also in LaPorte. He testified that he bought it with financial assistance from his mother-in-law as a HUD foreclosure with plans to remodel for profit. [*Id.*] Ross then said that despite doing some preliminary work on the house, he no longer planned to remodel the property, and he incorrectly stated that it was in foreclosure — perhaps mistakenly believing that Bradley was referring to the fact that Ross purchased it out of foreclosure, not the current status of the property [*id.* at 531-32]. In any event, Ross said the property was "in foreclosure" when it plainly wasn't. After the 341 meeting with Bradley, Ross filed amended schedules on September 21, 2016, listing the property as "condemned" and worth $10,000. [*Id.* at 70.]

Bradley then conducted further investigation into Ross's financial affairs. [*Id.* at 494-95.] He determined that the 408 G Street property had a current, fair market value of $10,000-$15,000 and that it "may be subject to the equitable lien of the purchaser of that property, Ms. Pam Koehn, the Debtor's mother-in-law." [*Id.* at 494.] How Bradley learned of the equitable lien is unclear; it's not reflected in the record. But the parties

agree that title was solely in Ross's hands at the time he filed bankruptcy and that no lien in favor of Koehn was ever recorded. [*See id.* at 506-521.]

The price range Bradley gave for the 408 G Street property came, in part, from a third-party appraisal provided to Bradley by Ross and his attorneys. [*See id.* at 473-493.] It valued the property at $13,500, and "in inferior condition now as compared to the condition at the time of the December purchase. This is due to demolition work" which had been done on the property by Ross. [*Id.* at 477.] The appraisal also contained "comparables" to other foreclosed properties in the area. [*Id.* at 493.] As a result, Bradley determined the property had little value to Ross's creditors given the amount of money which would be necessary to put the home in marketable condition as well as the supposed lien from Ross's mother-in-law. [*Id.* at 494-494.] Further, Bradley concluded that Ross had no substantial interest in machinery or tools in his name, as all the tools Ross used for his business were the personal property of his father and leant to Ross to use. [*Id.*] In sum, Bradley concluded that Ross had no interest in property of recoverable value and filed a Report of No Distribution, asking the bankruptcy court to discharge Ross's bankruptcy as a no asset case. [*Id.* at 495.]

O'Connor was not satisfied with trustee Bradley's conclusions. She filed an adversarial complaint on September 30, 2016, opposing the discharge of Ross's bankruptcy under 11 U.S.C. § 727(a), alleging Ross concealed assets and made false oaths on his bankruptcy pleadings. [*Id.* at 141-45.] Ross filed a motion to dismiss with sanctions on December 6, 2016. [*Id.* at 146-147.] The motion to dismiss was denied, and

the matter was eventually set for trial approximately fourteen months later, in February 2018. [*Id.* at 237-41, 255.]

On April 21, 2017, however and before the trial, Ross deeded 408 G Street to his mother-in-law via quitclaim deed. [*Id.* at 396-97.] This transfer is at the center of this appeal. All agree that it occurred after trustee Bradley indicated he would not pursue a sale of the property, but unquestionably while Ross's bankruptcy was pending and before any discharge. During the trial 10 months later, Ross testified that he transferred the property on the advice of his previous counsel (Ross obtained new counsel before the trial), because of alleged back-taxes owed on the property that he says he couldn't afford. [*Id.* at 533-534.] Ross further testified that he bought the property in December 2015 for $21,500, and that on a multitude of different purchase documents, he was the only person listed as purchaser or owner. [*Id.* at 506-16.] He also testified that the only lien on the property was from a company called Von Tobel Lumber, for materials for a different property Ross was working on. [*Id.* at 519-521.] Ross testified that his mother-in-law, Pam Koehn, gave him all the money to purchase the G Street property—some through a joint account and the remainder in cash. [*Id.* at 535-36.]

But there are some holes in the record about where the money to buy the property came from. Ross and Koehn had a joint bank account for his remodeling business, but Koehn testified at trial that she only transferred $500 to Ross, one time, and that she had no mortgage on the property. [*Id.* at 561-62.] Neither Ross's nor O'Connor's counsel asked Koehn about the rest of the payment that she allegedly provided Ross. So that remains unknown. [*See id.* at 557-63]. Furthermore, Koehn

testified that she did not pay any back-taxes on the property when Ross deeded the property to her in April 2017 for nominal consideration. [*Id.* at 563, 396-97.] And that's basically the extent of the evidence regarding the transfer of the 408 G Street property introduced at trial.

Trustee Bradley also testified at the trial. He testified that, in his opinion, Ross's initial omission of 408 G Street was not an "intentional deception or omission." [*Id.* at 578.] In fact, trustee Bradley stated that accidental omissions occur in approximately "five to ten percent" of bankruptcy cases, and he thought that was the case here. [*Id.* at 577.] He based this on his decades of experience as a bankruptcy trustee and interactions with Ross. On cross-examination, Bradley noted that he used an appraisal to assist in determining the value of the 408 G Street property but did not visit the property himself. [*Id.* at 582-83.] He said that personally visiting properties subject to a bankruptcy proceeding is not typical if he has "other information that satisfies [him] as to the valuation of the property." [*Id.* at 583.] Photographs of the property showing it in a relatively dilapidated condition were also introduced at trial as evidence of its value, or lack thereof. [*Id.* at 483-91.] When counsel asked Bradley if he knew what an "REO" (real estate owned[2]) property was—the comparable properties on the appraisal were REOs—trustee Bradley testified that he did not know. [*Id.* at 582-83.]

---

[2] REO properties are also known as "HUD Homes" and are residential properties that are acquired (thus owned) by HUD as a result of a foreclosure on an FHA-insured mortgage. Generally, after HUD becomes the owner of the property it then seeks to sell it to cover the cost of its foreclosure. *See* U.S. Dep't of Housing and Urban Development "HUD HOMES (REO)" (accessed September 5, 2019) https://www.hud.gov/program_offices/housing/sfh/reo.

O'Connor's counsel attempted to call a witness—the Chief Deputy Assessor from the LaPorte County Assessor's Office—to discuss the valuation of 408 G Street. [*Id.* at 564-65.] Ross had testified earlier in the trial that he met with the LaPorte County Assessor's Office to reduce the tax assessment on the G Street property, though his memory of the meeting was sparse. [*Id.* at 521.] This meeting occurred on July 2, 2016, one month before Ross filed for bankruptcy. [*Id.*] O'Connor's attempt to call the deputy assessor as a witness was to fill in gaps in Ross's testimony. In addition, O'Connor's counsel wanted this testimony in order to rebut the idea that Ross's initial non-disclosure of the property was anything but innocent, the theory being that Ross had so recently taken an active role in the property that it was improbable he would accidentally forget to list it.

The bankruptcy court didn't allow the deputy assessor to be called as a witness because she wasn't listed on the pretrial order. [*Id.* at 564-65.] But O'Connor's counsel did introduce the underlying evidence of the fact that Ross met with the LaPorte County Assessor's Office and had the tax assessment (and assessed value) of the property reduced shortly before filing his petition. One month before filing bankruptcy, Ross had the property value reduced to $38,200 [*id.* at 522], nearly four times the value that Ross listed on his amended schedules three months later when he valued the property at $10,000. [*Id.* at 98.]

After trial, the bankruptcy court ruled that O'Connor failed to meet her burden of proof under Section 727(a) and dismissed her objection. [*Id.* at 280-91.] The court found that "[n]othing in the record presented by O'Connor leads the court to plausibly

infer fraudulent intent by Ross or concealment of assets." [*Id.* at 291.] The court pointed to "Ross's quick action to amend his schedules" as "discredit[ing] any assertion that he was trying to hide property." [*Id.* at 288.] He continued, finding Ross to be credible witness and "a complete absence of fraud in his statements and unintentional omissions[.]" [*Id.* at 290.] The court also found trustee Bradley's testimony and conclusions credible, pointing to his "many years of experiences as a trustee." [*Id.* at 287.] Put simply, the bankruptcy court expressed no concern that Ross was anything but "the honest but unfortunate debtor" that bankruptcy is designed to benefit.

Yet there is something missing in the initial opinion of the bankruptcy judge. The April 2017 transfer of the 408 G Street property by Ross to his mother-in-law for no consideration went unremarked in the written opinions. O'Connor claims that the transfer – done ten months prior to trial and while the bankruptcy was still pending -- was a significant event. O'Connor's counsel raised the transfer as part of the concealment at trial [*id.* at 560] and referenced it again in post-trail briefing. [*Id.* at 261.] Yet the bankruptcy judge didn't discuss the transfer whatsoever.

And the saga doesn't end there. Two weeks after the bankruptcy court dismissed O'Connor's objection to discharge, she learned that 408 G Street was listed for sale on a realtor's website with an asking price of $114,900. [*Id.* at 303-08.] It was listed with the same realtor that Ross used to purchase the home. O'Connor moved to set aside or amend the bankruptcy court's order. In her Motion for Relief under Fed. R. Civ. P. 60(b) and Motion to Alter or Amend Judgment under Fed. R. Civ. P. 59(e), O'Connor cited the

listing as evidence of Ross's alleged intent to defraud and as "new evidence" justifying relief. [*Id.* at 296, ¶ 4.]

The bankruptcy court denied both of O'Connor's motions, noting that "the relevant date for the valuation of [408 G Street] is the date Ross filed for [bankruptcy], July 2, 2016[,]" and the "real estate listing from April 2018 is irrelevant" and not new evidence justifying relief under Rule 60(b). [*Id.* at 339.] The court reiterated its earlier findings that Ross's amendment of his asset schedule did not demonstrate fraudulent intent and trustee Bradley's conduct and testimony were credible. "The court found the credible testimony of Ross' experienced chapter 7 trustee convincing." [*Id.* at 340.] Further, the court found no evidence to "support any inference of [fraudulent intent] by Ross[.]" [*Id.* at 341.] The court found "no basis" for O'Connor's arguments and dismissed her motions. [*Id.* at 346.] And once again, the bankruptcy court did not reference, and thus it seems did not take issue with, the fact that Ross transferred the property without consideration prior to his discharge from bankruptcy.

O'Connor appeals these orders, asking me to overturn the bankruptcy court's denial of her Motion to Alter or Amend the Judgment and the denial of her Motion for Relief. She wants the bankruptcy court's discharge order reversed and the bankruptcy reopened, presumably so she can force an unwinding of the transfer of the 408 G Street property and sell it to satisfy Ross's debts.

**Legal Standard**

My review of a bankruptcy court's decision is generally a deferential one. The bankruptcy court's factual findings are upheld unless they are clearly erroneous—"in

other words, with a serious thumb on the scale for the bankruptcy court." *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 966 (2018). Legal determinations are subject to *de novo* review. *In re Dennis*, 927 F.3d 1015, 1017 (7th Cir. 2019). "Under the clearly erroneous standard, if the bankruptcy court's factual findings are plausible in light of the record viewed in its entirety, a reviewing court may not reverse even if it would have weighed the evidence differently." *Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004) "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because . . . it would have decided the case differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (quoting *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949) (internal quotation marks omitted)).

Further, I must give the bankruptcy court's assessments of a witness's credibility great deference. *Anderson*, 470 U.S. at 575. "[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* (citing *Wainwright v. Sykes*, 433 U.S. 72 (1977)). Unless I find that "[d]ocuments or objective evidence . . . contradict the witness'[s] story; or the story itself . . . [is] internally inconsistent or implausible on its face", the bankruptcy court's findings based on a witness's credibility "can virtually never be clear error." *Id.*

A motion for relief under Fed. R. Civ. P. Rule 60(b), and a motion to alter or amend a judgment under Fed. R. Civ. P. Rule 59(e), achieve similar ends, but they are

substantively different. *Harrington v. City of Chicago*, 433 F.3d 542, 46 (7th Cir. 2006).

Despite their differences, denial of both motions is reviewed only for abuse of

discretion. *Gleason v. Jansen*, 888 F.3d 847, 851-52 (7th Cir. 2009). "A finding based upon

no reliable evidence whatever is a clear error of judgment and an abuse of discretion."

*First Girl, Inc. v. Reg'l Manpower Adm'r of U. S. Dep't of Labor*, 499 F.2d 122, 124 (7th Cir.

1974); *Harrington*, 433 F.3d at 550. (finding that there was a factual basis for the lower

court's holding that circumstances surrounding a lawyer's personal life did not justify a

relief from judgment under Rule 60(b)); *see also Gonzalez v. Crosby*, 545 U.S. 524, 540-45

(2005) (affirming the lower court's denial of a Rule 60(b) motion because the lower

court's conclusion that a recent Supreme Court decision did not constitute

"extraordinary circumstances" was not an abuse of discretion).

## Discussion

O'Connor advances multiple arguments on appeal. First, she argues that that the

bankruptcy court abused its discretion when it denied her Rule 60(b) motion because

the April 2018 listing represents new evidence and Ross's fraudulent intent. [DE 7 at 10-

11.] Second, she argues that the bankruptcy court abused its discretion and committed

clear error by denying her Rule 59(e) motion because the court: (1) failed to consider the

timing of Ross's amended schedules and all his statements and pleadings when it found

no fraudulent intent; (2) found trustee Bradley credible even though he didn't know

what an "REO" property is and didn't personally visit the 408 G Street property to

determine its value; and (3) erred as to the legal status and value of 408 G Street and

prohibited O'Connor from introducing rebuttal testimony to establish the property's

value. [*Id.* at 1-2.] Third, she says that the transfer of 408 G Street post-petition was a per se violation of the Bankruptcy Code. I will address each argument in turn.

**A. O'Connor's Motion for Relief Under Fed. R. Civ. P. Rule 60(b)**

O'Connor first argues that the court erred in denying her Rule 60(b) motion because the listing of 408 G Street represents "new evidence" and shows "fraud . . . misrepresentation, [and] misconduct by [Ross]." [DE 7 at 9.] The essential purpose of Rule 60(b) is to undo the court's final decision on a case, but in a very limited set of circumstances. *See Buck v. Davis*, 137 S. Ct. 759, 779 (2017) ("[T]he 'whole purpose' of Rule 60(b) 'is to make an exception to finality.'"). Granting a Rule 60(b) motion is "an extraordinary remedy" and I should only do so in "exceptional circumstances." *Davis v. Moroney*, 857 F.3d 748, 751 (7th Cir. 2017). O'Connor asks me to grant this extraordinary remedy, invoking Rule 60(b)(2)'s new evidence and Rule 60(b)(3)'s fraud prongs. However, I find nothing in the record to suggest that the bankruptcy court abused its discretion in denying O'Connor's Rule 60(b) motion.

O'Connor's new evidence claim is fundamentally flawed. Importantly, "new evidence" under Rule 60(b)(2) and Rule 59(e) motions must have existed at the time of trial. *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 950 (7th Cir. 2019) ("Newly discovered evidence must have been in existence at the time of the original judgment or pertain to facts in existence at the time of the judgment.").

As the bankruptcy court correctly pointed out, the listing of the 408 G Street property is not "new evidence" as to the property's value at the time Ross filed for bankruptcy almost two years beforehand. [DE 8 at 344.] The only relevant date of

valuation for the property is the day Ross filed for bankruptcy. *E.g.*, *In re Rambo*, 297 B.R. 418, 424 (Bankr. E.D. Pa. 2003) (property of the estate's value is the "fair market value of the real estate as of the date of the filing"); *In re Warner*, 146 B.R. 253, 255 (N.D. Cal. 1992) ("[T]he Bankruptcy Court determined that, on the date of filing the bankruptcy petition, the subject real property had a fair market value of $234,000."); *In re Mitchell*, 103 B.R. 819, 820 n. 1 (Bankr. W.D. Tex. 1989) ("'Value' means fair market value as of the date of the filing of the petition . . .") (citing 11 U.S.C. § 522(a)(2)). That value was provided to the court by trustee Bradley. [DE 8 at 494-95.] As of the date Ross filed bankruptcy, the appreciation in the property's value shown by the real estate listing "did not exist." [*Id.* at 344.] There was no "new evidence" to discover at the time. Instead, the listing of the property was a subsequent development which occurred, albeit close in time, *after* the bankruptcy had closed. That is not what the "new evidence" prong of Rule 60 is concerned with.

O'Connor's claim that the listing of 408 G Street is evidence of fraud is also without merit. To prove fraud under Rule 60(b)(3), O'Connor must show that "(1) [she] maintained a meritorious claim at trial; and (2) because of [Ross's] fraud . . . ; (3) [she] was prevented from fully and fairly presenting [her] case at trial." *Walsh v. McCain Foods Ltd.*, 81 F.3d 722, 726 (7th Cir. 1996) (citing *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1997)). Even assuming O'Connor's claim that the property's value in 2016 was greater than Ross or trustee Bradley proffered was credible, the April 2018 listing is not relevant to that claim. Trustee Bradley investigated the value of the property in November of 2016 and determined it was worth between $10,000-$15,000. [DE 8 at 494.]

Perhaps that is debatable through the lens of hindsight, but as the bankruptcy court stated, the only thing the listing in April 2018 proves is that someone put a lot of time and money into refurbishing 408 G Street after trustee Bradley decided it wasn't worth pursuing. [*Id.* at 339.] Importantly, the bankruptcy court stated that "[p]hotographic evidence at trial showed [408 G Street] in ramshackle condition." [*Id.*] The April 2018 listing has no bearing on any alleged fraudulent conduct by Ross two years beforehand. Temporally, the listing of the home after the conclusion of the bankruptcy, does nothing to show that Ross had fraudulent intent to conceal assets or that he committed fraud upon the bankruptcy court, who was aware of the property at the time of trial.

What's more, O'Connor offers no evidence that Ross performed undisclosed work on the house to increase its value prior to trial or conceal anything from the court. Instead, she offers speculation, albeit reasonable speculation. But that just isn't enough. Essentially, she's asking me to reweigh the evidence from trial in her favor, but this is not task as the reviewing court. *Freeland*, 540 F.3d at 729. The bankruptcy court's factual findings are more than plausible given the record, meaning I cannot substitute my own judgment for the bankruptcy court's. *Anderson*, 470 U.S. at 573–74. Therefore, the bankruptcy court's assertion that O'Connor's Rule 60(b)(3) motion "is not supported by the law or record" was correct, and not an abuse of discretion. [DE 8 at 345.]

### B. O'Connor's Motion to Alter or Amend Judgment Under Fed. R. Civ. P. Rule 59(e)

A Rule 59(e) motion allows the movant to alert the trial court to a manifest error fact or law, or newly discovered evidence. *LB Credit Corp. v. Resolution Tr. Corp.*, 49 F.3d

1263, 1267 (7th Cir. 1995). However, "[i]t 'does not provide a vehicle for a party to undo

its own procedural failures, and it certainly does not allow a party to introduce new

evidence or advance arguments that could and should have been presented to the [trial

court] prior to judgment.'" *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524,

529 (7th Cir. 2000) (quoting *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996)). The

decision to deny or grant a Rule 59(e) motion is "entrust[ed] to the [trial court's] sound

judgment" so my review here is "commensurately deferential"; I can only reverse if I

find an abuse of discretion at the bankruptcy court. *LB Credit Corp.*, 49 F.3d at 1267.

With that standard in mind, I turn to O'Connor's substantive arguments.

"[T]he Bankruptcy Code was meant to discharge only an honest debtor from his

or her debts . . . the Code should be liberally applied to protect the [debtor] only in

those cases where there is no intent to violate its provisions." *Disch v. Rasmussen*, 417

F.3d 769, 774 (7th Cir. 2005) (quoting *In re Suttles,* 819 F.2d 764, 766 (7th Cir. 1987)

(internal quotation marks omitted) (alteration original); *see also In re Chlad*, 922 F.3d 856,

860 (7th Cir. 2019) ("Discharge under Chapter 7 is reserved for the honest but

unfortunate debtor."). Section 727(a) of the Bankruptcy Code calls for a debtor's

discharge, subject to certain caveats (mainly for fraud and dishonesty on the part of the

debtor). O'Connor argued at trial and in her post-trial motion that Ross violated two

subsections of this provision which provide sufficient bases for denying discharge in

this case: (1) Section 727(a)(4)(A) by omitting 408 G Street from his original bankruptcy

schedules and misleadingly undervaluing the property; and (2) Section 727(a)(2) by

doing the same and then executing a deed for the property to his mother in-law. [DE 7

at 19-20.] Given that a violation of either acts as a bar to Ross being able to receive a discharge, these exceptions are construed strictly against O'Connor and liberally in favor of Ross. *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002), *aff'd sub nom*, *Kontrick v. Ryan*, 540 U.S. 443 (2004).

### 1. Section 727(a)(4)'s Prohibition Against False Oaths

I'll begin with O'Connor's claim that Ross's initial failure to disclose his interest in the 408 G Street property, followed by the way in which the property was subsequently valued, constituted a false statement worthy of preventing his discharge from bankruptcy. To bar discharge under § 727(a)(4) for false oaths, O'Connor must show "(1) [Ross] made a statement under oath; (2) the statement was false; (3) [Ross] knew the statement was false; (4) [Ross] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Kempff*, 847 F.3d at 449 (quoting *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011)) (internal quotations marks omitted). Elements (1), (2), (3), and (5) are typically easy to show when an (a)(4) violation is alleged. *See, e.g.*, *Chlad*, 922 F.3d 856. Here, they are hardly in dispute, as everyone agrees Ross did not initially include the 408 G Street property on his list of assets when he first filed for bankruptcy.

This brings us to fraudulent intent, the trickier of the elements to prove. This requires a showing of specific intent to deceive the trustee or creditors. *Id.* at 862 (quoting *In re Katsman*, 771 F.3d 1048, 1050 (7th Cir. 2014) (internal quotation marks omitted)). This deception does not have to be for the purpose of obtaining a pecuniary benefit. *Id.* Rather, a debtor's "reckless disregard for the truth" can be sufficient to prove

fraudulent intent. *Kempff*, 847 F.3d at 449 (quoting *Stamat*, 635 F.3d at 982). A reckless

disregard for the truth is "not caring whether some representation is true or false . . . ."

*In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998). Fraudulent intent can be inferred "in light

of a 'larger picture of omissions and errors ... the totality of the [debtor's] omissions and

errors rises above mere negligence to the level of reckless disregard for the truth.'"

*Chlad*, 922 F.3d at 862 (quoting *Stramat*, 635 F.3d at 982) (alteration original). Mere

negligence or misunderstanding though cannot serve as proof for fraudulent intent. *Id.*

      O'Connor argues that the bankruptcy court did not appropriately consider the

timing of Ross's amendment to his schedule and his various statements to the court and

to trustee Bradley when it found no evidence of fraudulent intent. [DE 7 at 16-21.] She

argues that Ross amended his schedules only after inadvertently discussing the 408 G

Street property during his Section 341 meeting with trustee Bradley, and that Ross's

subsequent amendment doesn't cure his original omission. [*Id.*] She argues that even if

this isn't evidence of clear fraudulent intent, Ross's actions at least demonstrate a

reckless disregard for the truth, justifying denial of his discharge. [*Id.* at 20-21.]

      "[B]ankruptcy law imposes upon one seeking its benefits the positive duty to

schedule for the benefit of creditors all his interest and property rights." *Cincinnati Life

Ins. Co. v. Grottenhuis*, No. 2:10-CV-00205, 2011 WL 1107114, at *4 (S.D. Ind. Mar. 23,

2011), *aff'd sub nom. Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939 (7th Cir. 2013) (citation

and internal quotation marks omitted). "[D]ebtors have an absolute duty to report

whatever interests they hold in property, even if they believe their assets are worthless

or are unavailable to the bankruptcy estate." *Chlad*, 922 F.3d at 864 (quoting *In re*

*Yonikus*, 996 F.2d 866, 904 (7th Cir. 1993); *see also Aikens v. Soul Circus, Inc.*, No. 09 C 6678, 2011 WL 2550828, at *3 (N.D. Ill. June 24, 2011) (debtors have a continuing duty to update schedules to reflect newly acquired assets). Given the catastrophic effect a failure to list an asset can have on a debtor's chances at obtaining a discharge, however, debtors have an absolute right to amend their bankruptcy petition at any time before the bankruptcy closes. Bankr. R. 1009(a); *Yoon v. VanCleef*, 498 B.R. 864, 869 (N.D. Ind. 2013). Courts generally looks favorably upon a debtor rapidly amending her bankruptcy schedules after realizing a genuine mistake. *See, e.g., In re Bailey*, 147 B.R. 157, 165 (Bankr. N.D. Ill. 1992) ("[S]ubsequent disclosures are evidence of innocent intent.").

O'Connor claims that that Ross's schedule amendment was the result of his accidental disclosure of 408 G Street during his Section 341 meeting, which "proves" fraudulent intent. The bankruptcy court fully rejected this argument, stating:

> O'Connor wants this court to infer evil intent from Ross's failure to originally schedule the G Street property. Were the court to adopt O'Connor's interpretation of an amendment, any debtor who amends schedules to include omitted property ought to have their discharge barred. The court does not read the statute in such a mechanical way. . . . Under the facts of this bankruptcy the court does not find it reasonable to categorize Ross's amendment to his schedules, an amendment perhaps prompted by the discussion at his § 341 meeting, as a discovered attempt to conceal assets for which the court should penalize him. Quite the opposite: The court finds Ross's voluntary amendment a sign of an honest debtor cooperating with this bankruptcy trustee and attempting to fulfill his obligation, under the statute and rules, to list all his assets and liabilities. Nothing in the record of this adversary proceeding, or in Ross's underlying bankruptcy case, supports the supposition that Ross was trying to conceal assets.

[DE 8 at 288-89.] O'Connor repeats her argument here, citing two cases for support. Neither is particularly instructive.

First, she cites *In re Bailey* from the Northern District of Illinois. She argues that since, in her view, Ross didn't admit to owning 408 G Street until the "the cat was out of the bag" and he was caught in a lie, his later amendment cannot ameliorate his deception. *Bailey*, 147 B.R. at 165; [DE 7 at 17.] However, O'Connor mistakenly simplifies *Bailey* so as to read out the requirement that she prove fraudulent intent. Denying discharge under § 727(a)(4) is not automatically triggered by a failure to disclose property. Rather, failure to disclose property *plus* a showing of knowledge, fraudulent intent, and materiality violates § 727(a)(4) *even with* later disclosure. *Kempff*, 847 F.3d at 449 (quoting *Stamat*, 635 F.3d at 978); *Bailey*, 147 B.R. at 164-65.

For example, in *Bailey* the debtor failed to list three bank accounts on his bankruptcy schedules. One of these was his thrift savings account, an account established through his employer that was funded through paycheck withholdings. 147 B.R. at 164-65. This account was his largest asset. *Id.* at 164. The case came down to whether this omission was done with fraudulent intent. *Id.* at 164-65. The court found that the debtor's omission of the two other accounts, a checking account and a credit union account, did not evidence fraudulent intent. While those two accounts were omitted, the debtor turned over the account records to the plaintiff and "answered all questions regarding his accounts[.]" *Id.* By contrast, the court did find fraudulent intent where debtor omitted the thrift savings account, which he had not later disclosed,

justifying his initial omission post-hoc as being because he thought the account was exempt. *See id.* at 159-61. Again, a mere omission alone is not enough to deny discharge; the ability to prove fraudulent intent is what carries the day. *Id.* at 164-65. Unlike in *Bailey*, Ross did not continue to try to conceal the 408 G Street property, he volunteered its existence at his Rule 341 meeting and then promptly amended his schedule to reflect its existence.

Next, O'Connor points me to *In re French*, No. 01-1058, 2003 WL 21288644, at *2 (Bankr. D. Vt. May 30, 2003) (cited in DE 7 at 17). In *French*, the debtor originally sought discharge as a chapter 7 bankruptcy, but later converted to a chapter 13 bankruptcy. *French*, 2003 WL 21288644 at *1. Creditors opposing the debtor's discharge filed their complaint before conversion and alleged a Section 727(a) violation under chapter 7 or, alternatively, a Section 1307(c) violation under chapter 13 for operating in "bad faith." *Id.* The court discussed debtor's omissions under the "bad faith" standard because the case was converted to chapter 13, finding the debtor's omissions were not in bad faith. *Id.* at *1, *5. Bad faith and fraudulent intent are different legal standards, so this case doesn't provide me much guidance. *Id.* Bad faith is a less stringent standard, as:

> There is no set formula to determine whether a plan is proposed in good-faith . . . [but good faith] is to be judged by the totality of the circumstances . . . [and] require[s] "honesty of intention" on the part of the debtor . . . [further,] the debtor [cannot] misrepresent[] facts in his plan [or] unfairly manipulate[] the Bankruptcy Code or . . propose[] his plan in an inequitable manner.

*Id.* (quoting *Connelly v. Bath Nat'l Bank*, No. 93-CV-6499L, 1995 WL 822677, at *3 (W.D.N.Y. Apr. 13, 1995)). By contrast, fraudulent intent is "intending to deceive, which

need not connote intending to obtain a pecuniary benefit." *Chlad*, 922 F.3d at 856 (quoting *Katsman*, 771 F.3d at 1050 (internal quotation marks omitted)).

Thus, the only help *French* gives my analysis actually cuts against O'Connor. In that case, the debtor's actions were far more suspect than the conduct O'Connor points to. For example, the debtor in *French* amended his schedules not once, but four times, changing things as simple as his income, adding creditors, living expenses, and employment information months after the initial chapter 7 filing. *French*, *2003* WL 21288644 at *3. The court even noted that the filing of these amendments was suspiciously correlated to "probing questions by the trustees and Plaintiffs." *Id.* If this conduct doesn't even rise to the level of bad faith, I don't see how Ross's single schedule amendment is sufficient to infer fraudulent intent. The bankruptcy judge's findings in this regard are certainly not clear error or an abuse of discretion.

This case law and much of the same evidence also cuts against O'Connor's argument that Ross committed fraud and sought to conceal his interest in a trailer and tools which belonged to Ross's father. [DE 7 at 21-23.] The tools were not of great value and not owned by Ross. O'Connor offered no real evidence to the contrary.

Concerning the property's valuation, O'Connor also says the bankruptcy court committed clear error in relying on trustee Bradley's judgment as to the value of 408 G Street. She says that because he didn't know what an "REO" sale was or that they shouldn't be used as comparable properties for valuation purposes, his testimony couldn't possibly be credible. [DE 7 at 17-18.] Like the bankruptcy court, I disagree. Trustee Bradley testified that in his decades of experience as a bankruptcy trustee, it

was unusual to physically visit real estate property personally; he'd only physically examine a property if he were unsatisfied with the valuation information provided. [DE 8 at 583.] Here, he received an appraisal of the property and made a judgment as to what he thought was its worth in its current state. Trustee Bradley's assessment was certainly less than the price the home was assessed at by the county assessor's office (discussed below) and lower than what Ross paid for it at the HUD auction approximately six months before, but not to the point that I can say that it was clear error or evidence of fraud warranting a denial of Ross's discharge. This is especially true considering the only work Ross had performed on the home was demolition work. "Real estate appraisal is not an exact science." *Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 715 (7th Cir. 1998).

To successfully argue that this was clear error, O'Connor cannot simply repeat the argument she made to the bankruptcy court and expect a different result. She must show me evidence that leaves me with the undoubted conviction that a mistake was made. This is especially true when assessing witness credibility. *Anderson*, 470 U.S. at 573–74 ("[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.") She has not done so here. In reviewing the evidence, although reasonable minds might differ, it is plausible that, based on the pictures provided of 408 G Street and trustee Bradley's testimony, the property's value was between $10,000 and $15,000 in 2016. Further, while O'Connor argues that trustee Bradley should not be deemed credible because "industry practice" doesn't allow for REOs to be used for comparable sales

purposes, she offers no record evidence supporting this contention. At the hearing, O'Connor asked me to take judicial notice of this "fact" as real estate 101, but that stretches the doctrine of judicial notice well beyond its confines. *See Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995) ("In order for a fact to be judicially noticed, indisputability is a prerequisite."). O'Connor failed to introduce evidence regarding this use of REOs at trial, and so there is no basis for me to find the bankruptcy court committed error.

O'Connor next argues the bankruptcy court erred in not allowing rebuttal testimony as to the property's value. [DE 7 at 13.] While O'Connor claims the basis for this exclusion was that the court did not find the evidence relevant [*id.*], that is not completely accurate. The bankruptcy court's primary reason for excluding the testimony was that the witness was not named in the pretrial order [DE 8 at 340], adding that even had the evidence been allowed, it would've had "insignificant impact on the outcome." [*Id.* at n. 10.] While the judge's adherence to the pretrial order was rather strict, trial judges are given great discretion in deciding how to structure litigation in their courtrooms. *Braun v. Lorillard Inc.*, 84 F.3d 230, 236 (7th Cir. 1996) (finding no abuse of discretion in district judge's decision to exclude a rebuttal witness not listed on the pretrial order because plaintiff failed to show "good cause" for omitting the witness from the order); *see also In re Redmond*, 399 B.R. 628, 633 (Bankr. N.D. Ind. 2008) (noting that the court has great discretion in deeming evidence proper); *O'Sullivan v. City of Chicago*, No. 01 C 9856, 2007 WL 671040, at *10 (N.D. Ill. Mar. 1, 2007) (denying motion for new trial and finding that it was proper to exclude a rebuttal

witness not listed on pre-trial order). I find no clear error or abuse of discretion in the court's decision to exclude the Chief Deputy Assessor's testimony because she was not included in the pretrial order.

**2. Section 727(a)(2)'s Prohibition Against Fraudulent Transfers or Concealment**

This brings me to the second subsection of the Bankruptcy Code that O'Connor says should bar Ross's discharge. And on this one, she gets some traction. Discharge can be denied under § 727(a)(2) if O'Connor can show (1) an act of transferring or concealing property any time subsequent to one year before filing for bankruptcy; (2) with the intent to defraud creditors or delay proceedings. *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 791 (7th Cir. 2002) (citing *Lee Supply Corp. v. Agnew (In the Matter of Agnew)*, 818 F.2d 1284, 1287 (7th Cir. 1987)); 11 U.S.C. § 727(a)(2)(A) (forbidding fraudulent transfer or concealment of debtor's property one year prior to filing petition); 11. U.S.C. § 727(a)(2)(B) (forbidding fraudulent transfer or concealment of bankruptcy estate's property after the date of the filing of the petition).

The point of these provisions is to prevent debts from being wiped away for individuals who improperly deplete their own assets in the lead up to declaring bankruptcy or after filing but before being discharged. To prove intent to defraud, O'Connor must show "by a preponderance of the evidence that [Ross] actually intended to hinder, delay, or defraud a creditor . . ." *In re Kempff*, 847 F.3d 444, 448 (7th Cir. 2017) (quoting *Village of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002) (internal

quotation marks omitted)). Under this provision, intent to defraud must be actual, not constructive. *Id.*

As an initial matter, I am puzzled by the fact that Ross's transfer of 408 G Street to Koehn, his mother-in-law, for no consideration, went completely unremarked upon in either of the bankruptcy court's written opinions. The quitclaim deed transferring the property was listed as an exhibit on the pretrial order, evidence of the transfer was adduced at trial, arguments were heard on the point, and O'Connor raised the issue in her post-trial briefing. [DE 8 at 240, 258, 261, and 560.] Specifically, O'Connor argued that:

> After the filing of his bankruptcy, and during the pendency of this adversary proceeding, shortly after a hearing on the motion to dismiss which he personally attended, Ross unapologetically prepared and executed a deed transferring the G Street property to his mother-in-law Pamela Koehn. Though he claimed that he did so under the advice of his prior counsel, he clearly knew that the property was subject to his bankruptcy at the time and was clearly identified as an issue with this pending adversary case. This transfer, alone, is indefensible under 727(a)(2).

[*Id.* at 261.] For reasons that we'll see in a moment, the transfer of the property while Ross was still in bankruptcy was an important issue that should have been addressed by the bankruptcy court, and the failure to do so requires reversal of Ross's discharge.

But before I get to the merits of the issue, I'll address a procedural argument raised by Ross at the hearing (but not in his briefing submitted on appeal). Ross says that I shouldn't even consider the transfer because O'Connor's complaint did not raise the issue. Perhaps this is the reason the bankruptcy court didn't address the transfer, although that is conjecture. The bankruptcy court did not say O'Connor waived or

forfeited an argument based on the transfer because she didn't amend her complaint or include it in her pretrial order. Instead, it was silent on the whole issue. In any event, I don't really view this as a different claim. It is better characterized as simply additional facts in support of her claim that Section 727(a)(2) barred Ross's discharge under either subsection 727(a)(2)(A) or (727)(a)(2)(B).

But even if O'Connor erred in not including it in her complaint, or in not amending the complaint when it occurred, Federal Rule of Civil Procedure 15 allows for amendments during and after trial. Fed. R. Civ. P. 15(b). Rule 15(b)(2) specifically says that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." *Id.*; *Lerch v. City of Green Bay,* 406 Fed.Appx. 46, 47 (7th Cir.2010) ("When a claim not raised in the complaint is briefed and decided without objection from the parties, we must treat that claim exactly as if it *had* been raised in the complaint."). As I noted above, O'Connor offered evidence at trial concerning Ross's transfer of the property to his mother-law-law, and she argued the point in her post-trial brief. [DE at 261.] So, the issue was raised by O'Connor below, but it was not addressed by the bankruptcy court.

Ross's waiver argument is a nonstarter anyway. He never argued that the issue was waived by O'Connor in his trial briefing, at trial, or in the post-trial briefing (or even in the appellate briefing before me). At trial, he objected that work done to the property since April 2017 was irrelevant and the bankruptcy court agreed, but ample evidence was adduced concerning the transfer itself. [DE 8 at 561.] Ross never raised waiver of the argument in the bankruptcy court, or before me until the time of oral

argument in this court. Failing to raise an argument in briefing and instead raising it for

first time at oral argument is improper. *Quality Oil, Inc. v. Kelley Partners, Inc.*, 657 F.3d

609, 614-615 (7th Cir. 2011) (arguments raised for the first time at oral argument are

waived) (citing *Valentine v. City of Chicago,* 452 F.3d 670, 680 (7th Cir. 2006). Ross

therefore waived the waiver.

Now on to the substance of O'Connor's argument that the transfer of 408 G Street

after Ross filed for bankruptcy violated Section 727(a)(2). The outcome here is all but

dictated by the Seventh Circuit's opinion in *Village of San Jose v. McWilliams*, 284 F.3d

785 (7th Cir. 2002). I am surprised that neither party cited it in their briefing or

otherwise brought this case to my attention, but it is circuit law that I can't simply

ignore.

Because I find that *Village of San Jose* is dispositive here, an extended discussion

of that case is necessary. In *Village of San Jose* the debtors were an older couple residing

in a small village in central Illinois. 284 F.3d at 788. Among other assets, the McWilliams

owned a building in town which had fallen into disrepair. They received a letter from

the Village indicating that the property had been condemned and that they either

needed to repair it or the Village would demolish it and make them foot the bill. After

receiving an estimate to repair the building, the McWilliamses said they couldn't afford

to make the repairs or pay for the costs of demolition. *Id.* The Village made good on its

word and demolished the building pursuant to court order, which also granted it a lien

on the property to satisfy the costs of demolition. After the demolition, but prior to

receiving the bill for the demolition from the Village, the McWilliamses conveyed

several properties to their four grandchildren, including the lot on which the now-demolished property had sat.

When they received the bill from the Village, the McWilliamses filed a petition for bankruptcy. The Village, as a creditor, objected to a discharge. Shortly after that objection was made, the McWilliamses' grandchildren re-conveyed the properties back to the McWilliamses and a hearing on the objection was held. The Village said it was a clear-cut case of a violation of Section 727(a)(2) because the McWilliamses transferred the properties for nominal consideration to their grandchildren just before filing for bankruptcy. The bankruptcy judge, sympathetic to the McWilliamses, took a different tack and refused to deny the discharge based on Section 727(a)(2) because, in his view, while they did transfer the property within the impermissible one-year window prior to declaring bankruptcy, they rectified the situation. The Village, undeterred, appealed the discharge.

On appeal, the Seventh Circuit, despite some trepidation that doing so was likely an unjust result, reversed. It found that even though the McWilliamses "corrected" the transfer and had the property returned to them before they were discharged, the transfer could not be excused under the mandatory provisions of Section 727(a)(2). In answering whether the transfer was made with the requisite intent, the Seventh Circuit adopted the multi-factor test used by the Fifth Circuit. Given the difficulties in showing actual intent from an evidentiary perspective, the court looks at the existence of six factors:

> (1) The lack of inadequacy of consideration; (2) the family, friendship, or close relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*Pavy v. Chastant (In the Matter of Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989). "If the creditor can show that one or some of these factors are met," there is a rebuttable presumption that the debtor had fraudulent intent. *Village of San Jose*, 284 F.3d at 791.

Here, the bankruptcy judge did not engage in this analysis to determine whether there was fraudulent intent specifically as to the transfer. But it is clear that Ross's actions were at least presumptively fraudulent under this test. He transferred the 408 G Street property for (1) little to no consideration, and (2) to a family member. *Id.*; *see also In re Coppaken*, 572 B.R. 284, 314 (Bankr. D. Kan. 2017) ("[T]he transfer to a family member makes the transfer more suspicious, not less.") (denying discharge where debtor transferred LLC interest to son post-petition for less than its fair market value). And there is no evidence in the record that I can see which overcomes this presumption, beyond Ross's prior conduct in disclosing the existence of the property months before.

At the time trustee Bradley valued the property (fall 2016) it was in a state of disrepair. As discussed above, the valuation trustee Bradley gave the property was within the range of reasonable values and I agree that Ross's original failure to list the 408 G Street property on his disclosures, followed by his prompt admission to ownership at the Section 341 hearing and subsequent amendment, negates any notion

of fraudulent intent on that issue. And thus, perhaps like in *Village of San Jose*, the bankruptcy judge in this case "felt there was no harm done", 285 F.3d at 794, because trustee Bradley had determined the 408 G Street property was not of sufficient value to be worth pursuing. The problem is, trustee Bradley stopped short of legally abandoning the property, instead proceeding as a no asset case. But a "no distribution report" is not "equivalent to abandonment of [an] asset," because abandonment "may only be accomplished as outlined in section 554" of the Bankruptcy Code and requires things like notice to creditors and a separate hearing. *In re Peregrin*, No. 12 A 1464, 2012 WL 5939266, at *4 (Bankr. N.D. Ill. Nov. 28, 2012) (quoting *Ultimore, Inc. v. Bucala (In re Bucala)*, 464 B.R. 626, 634 (Bankr. S.D.N.Y. 2012)); *Morlan v. Universal Guar. Life Ins. Co.*, 298 F.3d 609, 618 (7th Cir. 2002) ("[T]he trustee's attempt to abandon failed because the trustee failed to comply with the statutory requirements for abandoning an asset that is part of the debtor's estate. The requirements are exacting, in recognition of the potential harm to creditors . . ."). Thus, the bankruptcy court was incorrect when, in its order denying O'Connor's motion for reconsideration, referred to the 408 G Street property as "abandoned." [DE 8 at 339.]

Without formal abandonment, 408 G Street remained part of the estate and was a part of it when Ross transferred the title to his mother-in-law. The Bankruptcy Code prohibits such transfers. 11 U.S.C. § 727(a)(2)(B). At oral argument, I asked Ross's counsel point blank whether Ross had authority under the Bankruptcy Code to quitclaim deed the property to his mother-in-law after he filed his petition. He conceded the point unequivocally, agreeing that Ross did not have the legal authority to

transfer the property. And the consequence of such transfers generally is a denial of a discharge, the equities of the case notwithstanding. *Village of San Jose*, 284 F.3d at 794; *see also In re Bajgar*, 104 F.3d 495, 498 (1st Cir. 1997) (holding that the principles of equity "has no place under the [Bankruptcy] Code to the extent the statute addresses the question" of denying discharge under Section 727(a)(2)) (quoting *Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1189 (7th Cir. 1989)); *In re Davis*, 911 F.2d 560, 562 (11th Cir. 1990) ("The statutory language of section 727(a)(2)(A) is plain and unambiguous. . . . We recognize that our holding may work hardship in some cases, perhaps this one, but we are compelled to apply statutory law as enacted by Congress.").

Because the bankruptcy judge's written opinions were completely silent on the transfer, my best guess is that the bankruptcy judge assumed that Ross's transfer of the property was harmless, and thus irrelevant. Trustee Bradley determined the property to not be worth pursuing for the benefit of Ross's creditors. The bankruptcy court also at times focused on O'Connor's inability to show harm to any particular creditor. [*E.g.*, DE 8 at 289.] But showing specific harm to a creditor is not an element or factor to be considered when determining whether a discharge under Section 727(a)(2) should be allowed. *Village of San Jose*, 284 F.3d at 793 ("Even if the Village did not suffer any harm, the McWilliams' intent to defraud is all that is needed for a petition to be denied under section 727(a)(2)"); *Matter of Snyder*, 152 F.3d 596, 601 (7th Cir. 1998) ("We ourselves have stated unequivocally that 'proof of harm is not a required element of a cause of action under Section 727.'") (quoting *In re Smiley*, 864 F.2d 562, 569 (7th Cir. 1989)); *In the Matter of Krehl*, 86 F.3d at 744, n.4 ("Yet so long as the debtor acted with the requisite

intent under Section 727(a)(2), his discharge may be denied even if creditors did not suffer any harm.").

The evidence that this was a simple transfer of title because Koehn was the real owner in interest was, at best, mixed. Ross testified that he had a joint account for his business with Koehn and that Koehn gave him cash and deposited money in that account for the purchase of 408 G Street [DE 8 at 536]. But Koehn testified she only gave Ross $500, one time. [*Id.* at 562.] Ross testified that he transferred the property because years of past due property taxes were due and the home was going to be sold at auction [*id.* at 534]. Yet Koehn testified that she did not pay any property taxes after the property was deeded to her. [*Id.* at 563.] Further, trustee Bradley and the bankruptcy court operated under an assumption that Koehn had an equitable lien in the home, but none was ever recorded or offered into evidence. Koehn even denied she had any mortgage on the property. [*Id.* at 561-62.] In connection with the post-trial motions, Ross submitted an affidavit stating that he did not list the property and did not stand to benefit from its sale. [*Id.* at 334.] But that does nothing to dispel whether he transferred the property to a family member for no consideration during the pendency of his bankruptcy. The point isn't whether Ross will receive a benefit from the sale now, the question is whether he intentionally transferred or sought to conceal the asset from his creditors. The testimony is contradictory and for it to go unremarked upon was clear error and thus undercut's the bankruptcy court's decision as to O'Connor's Section 727(a)(2) claim.

On remand, the bankruptcy court should allow for further factual development, including the introduction of evidence (or lack thereof) of Pam Koehn's equitable interest or equitable lien on 408 G Street, when and how the property was refurbished, and the circumstances under which it was conveyed to Koehn, such as whether it was on the advice of Ross's former counsel. Without that evidence, it's hard not to view this as anything but an effort to conceal or transfer assets by Ross. If Koehn was the real owner in interest of the property the whole time and Ross only held legal title but no equity interest, then the asset probably wouldn't be his and thus its transfer would not run afoul of Section 727(a)(2). *E.g.*, *In re Jeffries*, 378 B.R. 248, 253 (Bankr. W.D. Mo. 2007) ("Debtor's destruction or misuse of fully-encumbered property (and property with no equity) does not warrant denying him a general discharge under § 727 of the Bankruptcy Code because such an act does not harm the unsecured creditors whom the section seeks to protect."); *In re Ellefson*, 54 B.R. 16, 17 (Bankr. W.D. Wis. 1985) (transfer of collateralized cattle in which debtor did not have an equity interest not a "transfer" of his "property" for purposes of Section 727(a)(2)). If that's the case here, there would be no basis under Section 727(a)(2) to refuse Ross a discharge. But there's insufficient evidence to support that contention at this point and the evidence before me suggests Koehn did not in fact have such a dominant equitable interest in 408 G Street at the outset of Ross's bankruptcy.

In sum, the inequities in *Village of San Jose* were immense—probably more so than in this case. After all, the property at issue in *Village of San Jose* was actually returned to the estate prior to discharge. Not so here. And while the result in *Village of*

*San Jose* might strike some as a triumph of legal formalism, any questioning of the opinion by me is, of course, neither here nor there. In a system of courts shaped like a pyramid where I reside near the bottom, my preferences are unimportant in the face of clear circuit authority.

## Conclusion

For the foregoing reasons, the bankruptcy court erred when it failed to address the transfer of the 408 G Street property in either of its written opinions. But because the factual record developed in the lower court is insufficient in my opinion to definitively find a violation of Section 727(a)(2), I will not deny Ross's discharge outright. Accordingly, the bankruptcy court's judgment is REVERSED, and the matter is REMANDED for further proceedings not inconsistent with this opinion.

SO ORDERED on September 9, 2019.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT